Jack Leeson v. Transamerica Disability Income Plan My name is Steve Krafchick and I represent Jack Leeson. I want to talk a little bit, I think, about what I think is the driving issue in this case, which is the lost plan, which was given short shrift by the District Court. Mr. Leeson became disabled under long-term disability benefits and began in 1996. Leeson received benefits under the Transamerica Plan for four and a half years. All of the arguments that Agon, standing in for the Transamerica Plan, will make today or at any time fail because they don't have the plan that was in effect at the time Mr. Leeson went out on disability. They have not produced it. They enjoyed a presumption by not producing it that they had properly amended it and had a new plan in effect. Let me ask you this. I know you start out by saying this is the driving issue, but the District Court didn't have, at least as I recall, and you can correct me if I'm wrong, but the District Court didn't have the benefit of our recent en banc opinion in abiding. That's correct, Your Honor. But doesn't that really play an important part in this? Because the District Court said that it was going to review for abuse of discretion and didn't have the benefit of the analytical structure that we set forth in abiding for deciding whether or not to apply de novo or abuse of discretion. One factor that might well affect that is, you know, that the plan was not available. Obviously, abating was decided after this opinion was given. I don't think you get to the issues raised in abating if you accept that they lost the policy that applied in 1996 and had an obligation to keep it. Counsel, I'm really puzzled in this case. What do we say were the terms of the lost policy? How can we know? Was it more beneficial, less beneficial? Well, what we do know is that under the lost policy, prior to the development of the restated policy, which was in July of 98, that Mr. Leeson qualified for benefits beyond a putative change in the disability definition. We know they paid him for four and a half years. If there was a change like the original letter said at two years, they evaluated and did a very careful review at that point and then issued a letter in 1998 saying, you know, we're going to continue your benefits. And yes, they said they're going to keep looking at it, but they always say that. They don't say they're never going to take somebody off. So your position is that the plan must have just provided the individual has to be disabled? I guess that's not exactly our position. If you look at, first of all, go back to NORD, in saying that Social Security cases weren't going to apply in overruling the Ninth Circuit, they did say this, the validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn in large part on interpretation of the terms of the plan at issue. Now they didn't provide the plan. In order for us to overcome gross Solomon for a vesting defense, we have to show in the plan that there was language that did not, that did vest the policy. Because they had the obligation to keep the plan and they lost it, then they get, subject to the spoliation law, we get a presumption that it goes to the upside of our claim. Well, if we don't agree on that spoliation claim, and I think that's a bit weak, where does that take us? Then you're flat into Abatey and Safon and the overall analysis of the case, which I'm glad to address if the court wants me to. I think Judge McEwen has a question. Would you agree that in light of Abatey or Boddy, if we put ourselves in that posture that the case would need to go back because the court didn't have the benefit of that structure for evaluating the evidence? I think one option would be to remand it. The other would be to take it on the record as it stands. Under Abatey, they require certain disclosures according to the regulations. The regulations say you have to tell the person about what disability plan you went out under, what the policy language pertinent to the decision is. If the 1996 plan had the pertinent provisions, they can never meet the requirements under Abatey. They can never meet the requirements under Safon for a meaningful discussion with the claimant in a manner that the claimant can understand. In Judge Martinez's opinion, he absolutely said that there were procedural problems with the various letters, that they never disclosed the proper language in the basic plan. And then you have the issue of what do you do with the subsequent neuropsych evaluation and vocational evaluation. And under Safon, if they have impaired Mr. Leeson's ability to perfect his claim, then that evidence gets considered, too, but you have it before you. So we would urge, you indicate that you think the spoliation argument is weak. And I think I want to... I'm speaking only for myself. Well, you are an important person on this panel, I think. There's no dispute that they lost the policy. That's admitted. So then the question then is what is the effect of that loss? The glinch pin of Judge Martinez's opinion is, is that the 1998 plan, which he applied the language of, was the proper plan to apply. And in that case, I mean, without it, you can't know. You can't know so many different things, like what is the definition of disability in that plan? What is the limitation on mental health in that plan? What is the vesting language in that plan? Just to mention a few. So if you accept that they lost the plan, and if you believe that they had an obligation to keep it, which I believe they did, and we briefed that, then you come to the unescapable conclusion that the loss of the plan is therefore their obligation, and the assumptions go against it. The presumptions go in our favor, in favor of merits. Then you look at the status quo ante, which is what was going on with Jack Leeson prior to the time they denied him, and you provide Jack Leeson has qualified for benefits for four and a half years under the old plan, and it's only when this restated plan and he gets denied. And they go and look at evidence that the previous people had carefully rejected, and now they're going to bring it up again. And they cut him off both on saying that he could do his job and on the mental health provision, but the mental health provision is important, whatever it said. But if you accept what the AGON policy restatement said, there are two different definitions that they provide. One in the summary plan description, and then one in the actual plan. And they're distinctly different. So I don't want to belabor the points, but that's essentially where we're coming from. Now, the district court apparently relied on what was the statement in the summary plan. Is that accurate? The district court, yes. The district court relied on that statement. He included the suffering language as opposed to the dual cause language. And under ERISA law, the plan would control over the summary plan. Well, this is a messy case. I agree, Your Honor. It's 3,3700 pages of claim file. But in reality, the spoliation argument avoids all of that, gets the case resolved, and gets Mr. Leeson his benefits. I'll reserve the remainder of my time. Thank you. May I please the court? I'm Ashley Abel, representing Transamerica. Let me first address one of the issues that was last raised. And it goes to this vesting issue. And the statement was made that Transamerica, which is now essentially Agon. Agon took over the Transamerica company and its assets, and also took over the responsibility for this plan that's at issue today. So we have a corporate transaction. The prior plan documents from pre-'96 going back to 1980, according to the restatement of this plan, were in the possession of a separate corporation, Transamerica. I do not agree that there has been any stipulation in this case that my client has lost the plan. There's at least some question as to whether it ever received the original plan. But as of the time it took over the plan, what was in effect was the 1997, January 1, 1997, plan documents that are before this court. Well, you're not suggesting that the prior plan couldn't possibly be controlling in this case. It might provide some evidence to the court, Your Honor. And that brings up a very important point that I think I should address. This case... Let me just stop your statement, because if I follow your line of logic, simply because there's some kind of merger and acquisition, and you didn't happen to get the documents, somehow makes them go out of existence or out of relevance. And that doesn't make any sense to me, because the real question is you have the obligation, it seems to me, in having such an acquisition or takeover. You are standing in the shoes of the previous company, are you not? I don't think that we are. I think we're standing in the shoes of the plan as it existed when they took it over. But let me see if I can... I understand your concern. Let me see if I can address it directly. First of all, the claim that was raised was raised in 1997. Under Groves-Solomon, that the plan is to be... The plan in effect at the time the claim is made... Actually, Groves-Solomon says, at the time the claim is denied, is the one that is to be in effect for purposes of that case. So that's point one. Well, I'm not sure that that's even accurate, because he'd been receiving benefits for four and a half years. So certainly his claim was made four and a half years before. Let me correct you on the date, John. The benefits began December of 96. The claim was made in 1997. The plan that we have before the court is January 1, 1997. So that under Groves-Solomon and the way that this plan was interpreted when the claim came in. So as we have in any arrested case, we have to put ourselves in the shoes of the decision makers at issue. That's where we began. Let me just make sure I understand that. So benefits began in 1996, and is that when he satisfied the waiting period? That's correct. But he made his claim in 97. In 97. He had to wait for that. Right. And the initial approval... That's correct, Your Honor. And the initial approval was made in 97. The ultimate denial was not made until 2001. So we start out with a plan administrator deciding a claim that it receives. It receives this claim in 97, and it is initially approved. Now, we'll talk about what evidence it had at that point in time because I think it's relevant to the case, but I'll leave that a little bit for the merits discussion. But still on this procedural issue, then we have a denial in 2001. A plan is supposed to look at the time it made its denial and provide that plan. Now, a question arises in this case whether plaintiff in this case, Mr. Leeson and his counsel, ever asked for this document, the prior plan documents in discovery in this case. The answer is they did not. Now, there's an allusion in the briefing that the prior plan document was asked for as a document request under ERISA during the administrative review process. That is absolutely false according to the documents in the record because here's what plaintiff's counsel asked for specifically, and I quote, the plan referred to in the October 19, 2001 letter. That is Supplemental Record 56. What was relied on in that 2001 denial letter was the 1997 plan. So that's exactly what was provided to Mr. Leeson pursuant to his request for documents under ERISA. So that's the first, in terms of chronology, that's the first time we have the document coming into question. The second time it could come into question is later on in this lawsuit whether a discovery request was made for it because there was none ever made. And my client's responsibility as the plan is to provide the document under Grote-Solomon that was in effect at the time that the decision was made, and that's exactly what happened. Now, if Mr. Leeson... Was it after discovery was closed that they made a request in a brief or alluded to it in a brief? They alluded to it, the issue, in a brief. And it's not in the record, but we made an internal review. Again, we don't have subpoena power. We don't have the power of discovery through the court as we would have previously, so we were unable to, in AGON, to find a copy of that prior planned document. But, again, that's in 2005. The request for documents could have been made in 2001, and the administrative review process was in 01, 02, and 03. So if you track it and hold the plan liable for not producing a document that it may never have had, but certainly plaintiff did not avail himself of the remedial processes of ERISA to obtain it previously, and also we would have to assume that Transamerica provided him a copy at some point, and we were not able to get into discovery on that point because we tried to limit the record in these cases. Let's just assume for a minute that... Could you explain one thing? Go ahead. Could you just explain one thing that I'm kind of having some trouble with? I read that sentence that you referenced from the case saying that the presumption is that you look at the plan at the time of the denial, and that makes sense to me, but then the plaintiffs say, but if you had a previous plan and somehow you had vested rights under that plan, then the subsequent plan, meaning the plan at the time of the denial, can't override it. Can you explain to me whether that's two inconsistent principles, or do they fit together in the ERISA context? Well, they don't fit together nicely in an ERISA welfare benefits context. If we had a pension plan, it would be totally different because of the anti-cutback rule. But the presumption of courts across the country is that in a welfare plan, the plan administrator or the plan sponsor retains discretion to amend or terminate the plan at any time. Now, what we do not have in this case, and it would be important, or could be important, is we do not have an affirmative allegation from Mr. Leeson in any way, shape, or form that he knew of something in that prior plan that gave him some sort of vested right. And secondly, in a disability plan context, in the facts of this case, it is almost inconceivable... I can tell you I've been doing this for 20 years. I've never seen a disability plan that would somehow vest a person in disability benefits such that they would never have to prove ongoing disability or continued disability, which is the real issue in this case. He was initially approved for benefits, and then documents were obtained, and then based on those documents, it was denied, and then the administrative appeal process took its own way as it should under the plan. So we haven't even had a suggestion, other than the word vesting has come out, about what in the world this prior plan could say. And logic and the background of, you know, since 1974, the case law under ERISA, I've never seen a plan that involved vesting of disability benefits that would keep someone from having to satisfy definitions or be able to prove their continued to be disabled. I guess the question would be... Thank you. ...whether there are definitions that were in the prior plan that might control what disability means. Unless there is vesting in the prior plan language, Gross-Solomon indicates that that ability of a plan sponsor administrator to change the plan, that you are subject to the interpretations and the iterations of that plan that come thereafter. But we don't even have that in this case, Your Honor, because we don't even have a clue as to what this alleged vesting was. Let's, I guess, turn to whether the district court applied the wrong definition when he was determining this case using the summary plan definition as opposed to the basic plan. Your Honor, the district court judge, Judge Martinez, had before him both documents. And in his order, he addressed several things. One is that the plaintiff himself, in his appeal, in the appeal process, his lawyer described the different provisions in the different plan documents as very similar. So we start with that. What does that... Don't we look at the language of the summary plan description and we look at the language of the plan? Yes, we do. Which is the... You know, if one is more beneficial to the claimant, you rely on that. Well, in this case, neither is more beneficial to the plaintiff. Why not? They are the equivalent wording. They may have a word or two different, and that's what the district court judge looked at very carefully. Judge Martinez looked at them, and like the plaintiff during the administrative review process, concluded these are very similar. They're almost interchangeable. Functionally, they mean the same thing. And no argument has been raised in the briefing before this court to suggest that there's some narrow way to carve one that would give benefits. What was the language in the summary plan description? Suffering... Is that the one that... Suffering from? Um... In terms of the disability itself? Not the mental part. Um... I think it is suffering from... Suffering from a disability, as it's defined in the plan. And then disability... The only real difference in the definition of disability is one says you cannot perform the essential functions, which sounds like an ADA definition. The other one says you can't perform the substantial and material functions. Our argument to the district judge and the district judge agreed, and I think rightly so, is those are the functional equivalent of each other. That's the only difference in the language of disability, are those few words. But the cause and suffering language certainly are different. They're different, but I think that they mean the same thing at the end of the day as it relates to this case. We have two questions in this case, Your Honor, and they were answered in the same way at every part of the appeal process. One is, was Mr. Leeson disabled for any occupation? This is not an ONOC standard. This is, can you do any job, period. Then he had to be able to be paid, what, 80% or something? That provision actually applies only later on if you're still receiving benefits and at some point you are able to gain 80%, then that, but that kicks in later. The fundamental premise is you have to be disabled under the terms of the plan. And then the second issue, which has gotten, I think, a little bit more attention in the case, and that is the mental aspects to it. Now in the mental aspects, the language, if the disability was caused by the mental disability, that's different from suffering from a mental disability as I see it because here he had all these pains and all these different things and then that might have triggered his depression and his other things. And that's, he could be suffering from it but the disability wasn't caused by it. I'm looking for the language now, Your Honor. I'm not, I do not believe that's the way that, well that's not the way that I remember the language being stated and that's the reason I was trying to find it. Because with regard to the mental, one says you have a, if the disability is based upon a mental condition or is secondary to a mental condition, then it meets the exclusion essentially or that provision of the plan. And I think that the SPD says in function the exact same thing. I think you're using a different language now. Right. Could you just go to the basic plan language which I think is what Judge Fletcher was referring to and then I thought that that's where the caused by language is used. Yes, if the disability is caused by a mental condition. Yeah. By other than. If suffering from, or caused by a mental or nervous disorder. Right. Right. And that's different language than the supplemental plan language which puts it in a different light. That's correct. That's correct. But the supplemental plan language is not before the court. The supplemental plan is a totally separate plan document. There was some mixing and matching. Yeah, they mixed and matched. There was mixing and matching. The summary plan description, there are two documents that relate to the 97 plan that's at issue in the case. One is the 97 what we call the plan document which is the bigger document. The other is the 1997 summary plan description. Those are the functional equivalent of each other. Now, at the same time when this case initially arose there was a supplemental plan and there was another defendant in this case and that was Prudential. The language of their supplemental plan is different than the two versions of the same plan that are before the court today. So we have to make a distinction between what two documents relate to the issues that are before the court today. Tell me whether I'm mistaken or not that the language in the summary was suffering from and that the language in the basic plan was caused by. Now, am I wrong? I am feverishly looking through my brief which I should have it tabbed to that page in anticipation of the question. Unfortunately I tabbed other things. My recollection if you are suffering from a mental or nervous disorder alcoholism or drug abuse or any secondary condition resulting from that that's the language from the basic plan. That's the basic plan or is that the summary? I believe that comes from the summary plan description. Yeah, but that's the summary plan description. But what's the basic the real plan? What does it say? If you would permit me I can step and find it right quick. I do not have it quoted in front of me. This is reading from supplemental record excerpt page 85. In the case of a covered  whose disability is caused by other than a mental or nervous disorder he or she is unable to perform the essential functions. Then there's paragraph B that also reads whose disability is caused by a mental or nervous disorder or any secondary condition resulting from that. So our position is with regard to the SPD and the plan document on this point that are before the court they say the same thing. I guess that's where our disagreement is. There was one other point that Judge McEwen alluded to just a moment ago and that was that in some of these denial letters they mixed and matched. That's true. They mixed and matched and you couldn't really tell what they were relying on. The basic plan and the supplemental plan. That is true and I think Judge Martinez approached that in a reasonable way consistent with this court's precedent including abating and looked to see whether those alleged procedural errors actually resulted in any substantive harm. That's the test of this circuit. Did that result in any substantive harm to the participant? In this case the record is very clear that there was no substantive harm. We have several things. Gleason appealed twice under each case. That was my next point. These denial letters are all four to six pages long, as detailed as any denial letters you will see anywhere. To suggest that there was some piece of evidence that needed to be submitted in addition to support that is a red line. I would also say that that regulation was created because it says if something is necessary to perfect a claim, it doesn't say to perfect an appeal. That regulation was issued because some insurance companies hopefully long ago, and none still do it, my clients never do, hopefully not, would require a particular form to be used when you submit a claim. And the department wanted to avoid the situation where an insurance company could, despite receiving a mountain of medical evidence, could just say, oh, you didn't send that form in. They would have to have a burden to tell the individual that there is something that is required for you to do. And  why they were so upset about that whole case. And with good reason. That's not the case before. That was argued by opposing counsel, but every one of the denial letters quotes both of those reasons for denial. So there was no surprise and no prejudice to the other side. And then also Can I just clarify one thing? You had said earlier, well, you know, Judge, I thought you said that Judge Martinez considered abating, but he couldn't, didn't that come out after his decision unless there was some other order that I'm not familiar with? I hope I didn't say that, Your Honor. I didn't intend to. What I was saying is that this case is consistent with the abating precedent, which looks to whether there's substantive harm to the individual. Prior to that, we had the LaMantia case, which essentially said the same thing. And what I was arguing, Your Honor, is that that was consistent with the existing precedent clarified under abating. And the last point, if I could. Your time is almost up. It's over. You're over time, so make your point real quick. Leeson's counsel cited to both of the plans at issue in the respective appeals and had every benefit of knowing that language because he had both plans. Thank you, Your Honor. Okay. Thank you so much. This case has been very frustrating to me. I was counsel under and I'm counsel here now. Agon continually says we never ask for the plan. If you would go to the protective  discovery, it's docket number 15, page 9. This is Agon's memo opposing our request for discovery and describing our requests. The long-term disability plan that began and was offered by Transamerica. The identification of all plans available to employ Jack Leeson. So when I got the case, I couldn't understand it based on the record. And we sought discovery. And they objected to discovery. And they prevented us from doing any discovery. And I think now they have to live with that. And living with that means that they lost the plan and they're subject to this foliation law. Okay. Which definition applies here? The summary plan description or the basic plan or the supplemental plan or their mixing and matching? I believe that the correct definition is the definition in the basic plan, which is on page 83, which has the cause by language opposed to the suffering by language. If it was more favorable the other way around, the defendants would be arguing, and they always do, that they want to go back to the plan when the summary plan     If there was vesting language in that plan you go beyond what I think is fair to Mr. Leeson in that he does not have the original language. If there was vesting language in that plan there are a lot of issues in this case. One could argue that    have the original language in that plan. I don't know if it's correct yet and I haven't decided this case. Spoilation to me sounds like they've done something affirmatively to gain an advantage. There doesn't seem to be anything in the record here that suggests they did something affirmatively to gain an advantage. Even you refer to it as they lost the plan. So when you get to spoilation the court is usually responding by imposing some sort of sanction. That doesn't fit, that whole spoilation analysis doesn't seem to fit nicely within the plan. When I look at this and try to give it a framework within which to analyze it seems like you have a pretty good argument under abating that given the confusion in the plan terminology that was used here, the mixing and matching of letters, the potential for structural error, it just sort of looks like under abating that maybe this case had to go back to the district court and start over again. That's just kind of hard to look at this case. And your co-counsel there had a completely different way. You do too. You say spoilation is the maximum benefit period now. Mr. Leeson is now beyond the maximum benefit period in this plan. There's nothing that the court could do. And if you look at SAFON too, the comments by that court were telling and looking at chronic pain. And if you accept that the definition is the one in the statute,      It's not a crime. So we've had no effects on chronic pain problems that have been disabling him since he first went out in 1996. And one other point that is important, defense counsel says that he made his claim in 97. Well, what plan existed in January of 97 when he made his claim? It was the 96 plan. What plan existed up until July of 98? And before July of 98, Transamerica made a decision, Prudential made a decision to continue his benefits. So you're then left with a restated plan that they're asking you to apply that was in existence one month after they decided he satisfied whatever limitations existed in the policy. And they want you to relate that back. In that circumstance, if they could do that, they could decide we see a lot of fibromyalgia claims. And we don't want to cover fibromyalgia claims anymore, so we're going to properly amend this. And as of two years ago, we're going to cut off all people after two years because we're going to limit fibromyalgia for two years. It just doesn't make sense in the context of what people expect when they get disability insurance. Let me suggest, have you people been to mediation? Yes. And you're back out of mediation, is that right? It hasn't come up since Prudential settled. Have you been to our mediation staff? Yes. You may want another go. Thank you. Any other questions the court has? Judge McEwen? No. Thank you. Thank you. Thank you so much. The matter will be submitted. Thank you.   Thank you. Thank you.    Thank you. Thank you. Thank you. Thank you.
judges: Fletcher, McKeown, Paez